STATE OF IOWA, Appellee, v. SAM MITCHELL, Appellant.

CRIMINAL LAW: Appeal—Verdict Contrary to Evidence. The ap-
1   pellate court may not reverse a criminal cause unless it is able to
    say that the verdict is clearly contrary to the weight of the evi-
    dence.

CRIMINAL LAW: Evidence—Facts in Issue—Identity of Accused.
2   A police officer may testify to the fact that the prosecuting witness,
    when he made complaint that a crime had been committed, ''picked
    out a certain photograph as being the photograph of the man who
    had held him up.''

CRIMINAL LAW: New Trial—Misconduct of Counsel. Misconduct in
3   argument may not be shown by means of affidavits.

CRIMINAL LAW: New Trial—Newly Discovered Evidence—Want of
4   Diligence. New trial because of newly discovered testimony is
    properly denied when it is made to appear that the importance of
    the testimony became manifest before the close of the trial; that the
    witness was then obtainable; and that no effort was made to have
    a subpoena issued and served.

*Appeal from Woodbury District Court.*—MILES W. NEWBY,
Judge.

FEBRUARY 17, 1923.

REHEARING DENIED MAY 18, 1923.

APPEAL from a conviction of the crime of robbery with ag-
gravation.—*Affirmed.*

*Ray E. Rieke* and *George A. Gorder,* for appellant.

*Ben J. Gibson,* Attorney-general, *John Fletcher,* Assistant
Attorney-general, *O. T. Naglestad,* County Attorney, and *O. D.
Nickle,* Assistant County Attorney, for appellee.

ARTHUR, J.—I. The indictment charged that, on or about
the 15th day of June, 1921, Sam Mitchell and John Doe made

an assault upon William Polosky with a revolver, and took from
him $500. Prosecuting witness, Polosky, was a
single man, and lived with his sister, Mary
Cuknata, and her husband, in a rented house in
Sioux City. Polosky testified, in substance,
that defendant, Mitchell, came to his place, in company with
some other man, and held him up with a revolver, searched his
pockets, and took away from him $500 in money.

1. CRIMINAL LAW:
appeal: verdict
contrary to evi-
dence.

Mrs. Cuknata testified that she saw the defendant and an-
other man out at the garage at the time in question, and that,
ten or fifteen minutes afterwards, Polosky came into the house
and told her he had been robbed.

The defendant's testimony, briefly stated, was that Polosky
was engaged in bootlegging, and that he took a man by the name
of Welch to Polosky's place, for Welch to buy some liquor from
Polosky, and that Welch bought some liquor from Polosky, and
paid him for it with his check for $250; that Polosky and de-
fendant tried to cash the check, and failed; that Sam Mitchell,
defendant, was a ''steerer'' for Polosky, and was sending those
who desired to purchase intoxicating liquors to Polosky, under
agreement that he should get a portion of the proceeds derived
from the sales; that, while they were trying to cash the check,
Welch, who had been with Mitchell at Polosky's garage, and had
bought the liquor and given the check, disappeared with the
liquor, and Polosky then charged defendant with ''double-
crossing'' him. Thereupon, the defendant told Polosky that
he would see that he got the money on the check. Defendant
denied that he pointed a gun at Polosky, or that he took any
money from him.

Errors relied upon for reversal are:

(1) That the evidence is insufficient to support the verdict.

(2) That the court erred in admitting the testimony of a
city detective with reference to identification of the defendant
by the prosecuting witness, Polosky.

(3) Misconduct of the prosecuting attorney in argument.

(4) Requiring defendant to proceed to trial without time
for preparation.

(5) Error of the court in giving instruction with refer-
ence to reasonable doubt.

(6)   Error in refusal to grant a new trial on newly discovered evidence.

II.   The main argument made by counsel for defendant is on the assignment of error that the evidence is insufficient to support the verdict.   This involves an examination of the record.

Polosky testified that he knew the defendant; that he had seen him once in a pool hall; that the second time he saw him was at his garage, on June 15th, when he was held up by defendant and the other man who was with defendant; that he had just driven in from the country; and put his car in the garage, and asked him if he had some ''booze;'' that, just then, when he and Mitchell were talking about alcohol, the other man came into the garage and put a gun on his chest and held him up; that Mitchell went through his pockets and took $516 and the keys to his car; that the reason he happened to have the $516 in his pocket was that, some time before, he had loaned $500 to one Daniel Kootz, who lived out in the country a few miles, and on that day, Kootz had repaid him the $500 loan; that Mitchell and the other man came to his garage in a car.   Polosky testified:

''I am sure that this man [defendant] is one of the men that held me up.''

Polosky was subjected to a rigid cross-examination by counsel for defendant, for one purpose, as we take it from the record: to show that Polosky had not made any money or received any wages for any work or from any loan, as he claimed in his direct examination, but was engaged in the enterprise of bootlegging. Polosky denied ever having sold liquor.

Mary Cuknata testified that she was at home on June 15th; that defendant and another man came there at that time; that defendant asked if William Polosky was at home, and she told him that William had just come in, and was at the garage; that defendant then drove the automobile toward the garage; that she saw defendant and the man who was with him go into the garage; that defendant was one of the men; that she did not see them any more after they went into the garage; that, in about ten or fifteen minutes, her brother, William Polosky, came into the house, and that ''he looked pale and frightened.''

Fred W. Spencer, a city detective, called by the State, testified that he made the arrest of the defendant; that Polosky came

to his department about June 18th, and said that he had been robbed; and that he obtained from Polosky a description of the party that he claimed had robbed him. Witness was permitted to answer, over objections, that, from the description given him by Polosky, he showed him some photographs; that Polosky picked out a photograph of a person he claimed to be one of the men who had robbed him; that the photograph picked out by Polosky was that of defendant, Sam Mitchell; and that, from the description given him by Polosky, and from the photograph picked out by Polosky, he made the arrest of defendant. Witness further testified, over objection of defendant, that, after the arrest of defendant, Polosky and his sister, Mrs. Cuknata, came to the police station, and both of them identified defendant as one of the men who had visited the Polosky place. Polosky said that he was one of the men who robbed him.

E. Rushall, a junk dealer, called by defendant, testified that, during the years 1916 and 1917, he was on the road, buying junk; that he was acquainted with Polosky; that he met him in Minnesota, with a load of liquor, and that he opened a bottle and gave him a drink; that since that time Polosky had been a bootlegger all the time.

J. C. Morris, manager of the Capital Hotel, called by the defendant, testified that he saw Polosky and defendant in the American pool hall in June, 1921; that they were trying to cash a check for $200 or $250 on some bank in Sioux Falls; that they wanted him to cash it; that he did not cash the check.

John Abraham, a clothier, called by the defendant, testified that he knew Polosky and defendant; that, some time in the spring or summer of 1921, he had a talk with Polosky with reference to losing some liquor; that, one day, Polosky said to him:

"What do you think of it? I had pretty hard luck last night,—well, a couple of fellows took some alcohol away from me."

I. Mirkin, who ran a bakery, called by the defendant, testified that he was acquainted with Polosky; that he had heard about Polosky's claiming to have been held up; that he had a man working for him in his bakery by the name of Fred Burdick, who advised some Russians and Polacks in Sioux City on legal

matters; that he heard a conversation in the bakery between Polosky and Burdick; that Polosky told Burdick that two fellows had bought ten gallons of alcohol from him, and said: "They never did pay money, what can I do about this case? Can I collect from this fellow?" Burdick said:

"Why, now, I will tell you what to do,—I will give you good advice: you go down to the city attorney and swear out a warrant that this fellow held you up in your garage, and they have got to come across with your money."

Witness further testified:

"I do know absolutely about Fred's [Burdick] offering Polosky $250 to drop the case. He told Burdick that he had just seen Sam Mitchell in jail, and Burdick said to him: 'You go down there and tell him if this fellow could pick up this $250, this Polack [Polosky] would not show up at the courthouse for the trial.'"

Defendant testified in his own behalf that he was a Russian Jew, 24 years old; that he came to this country when he was 15 or 16 years old; that he had sold newspapers, as a boy, and later ran novelty stands at resorts; that he was in jail 14 days during July, 1921, on another charge; that he was arrested on this charge in August; that the police officers had taken his picture when he was in jail in July; that he knew Polosky; that he saw him some time in June; that he had shown Polosky a lot of fellows that Polosky sold liquor to; that a fellow by the name of Welch, from Sioux Falls, came to him and wanted to know where he could buy some alcohol; that he took him over to Polosky's on that day; that he found Polosky at home, introduced him to Welch, and told him Welch wanted to buy some alcohol; that Polosky told Welch to be there the next day, and he would have the alcohol for him; that, the next afternoon, he and Welch went to Polosky's house, and Polosky came out to their car; that Welch told Polosky he did not have any money,— that he would give him a check; that Polosky wasn't going to give Welch any alcohol at first; that he (Mitchell) told him he thought the check was good; that they drove to Polosky's garage, but did not go in; that Polosky carried out two 5-gallon cans of alcohol and put them in the car, and Welch gave him his check for $250, and Polosky got into the car with him and

they all drove down to the American pool hall, where they saw Morris and asked him to cash the check for $250 which Welch had given to Polosky; that Morris did not cash the check; that, while they were talking to Morris, Welch disappeared; that Polosky then "started to holler, and said it was my fault. I said, 'Don't get excited,—you will get your money;' and he said I had better see that he got his money; and after a while, I asked him if he had put the check through the bank, and he told me 'yes,' and that it came back; and he was hollering, and I told him the first chance I had to see that fellow I would see that he got his money. This was a fellow from Sioux Falls by the name of Welch. I had at different times in Sioux City steered fellows around to buy liquor. That was why I went down to Polosky's. I had steered fellows to Polosky's before that, who had bought liquor. He was selling liquor that I know of for the last two years. I was not arrested until two months after this. I never had a chance to see the Sioux Falls man after that."

Witness further testified that he got a commission for steering fellows to Polosky to buy liquor; that Welch was to pay Polosky $25 a gallon for the alcohol which Polosky delivered to Welch; that he (witness) got $10 for taking Welch to Polosky. Witness further testified that, when he went with Welch to the Polosky home after the alcohol, "Polosky came right to the door himself. I saw his sister." Witness testified that, when they failed to cash the $250 check which Welch had given Polosky for the alcohol, and they discovered that Welch had disappeared, Polosky said to the witness: "That is a fine thing to do. I have treated you pretty nice,—why do you double-cross me?" Witness said that he told Polosky, "I will see that you get your money;" that he did not know where Welch went; that he couldn't try to get the money after he was placed in jail; that he didn't have any friends on the outside. He further testified:

"I did not stick a gun at Polosky, and I did not take any money from him. There was nothing like that done."

Polosky, called in rebuttal, testified:

"I do not know this man Rushall. I never met him in Minnesota in 1917. I worked four months in California in 1917 and 1918. Before that I worked at Armour's. I went out to

California in the summer of 1918. I do not know this man Morris. I did not see him at the American pool hall in June. I did not have a check for $250. I never saw Abraham and told him somebody had stolen some alcohol from me. I was never in the American pool hall in June of this year with defendant to have a check cashed. I wasn't running any booze blockade. Never ran an automobile from Minnesota to Sioux City. I never sold any liquor in Sioux City.''

It will be observed from the evidence, which we have set out quite in detail, that there is a decided conflict, which· presents only an issue of fact for the jury to consider. If the story told by Polosky should be believed, the jury might find that Polosky was relieved of about $500 at the point of a revolver, and would be justified in finding defendant guilty. If defendant's testimony were to be believed, no robbery took place, even though defendant was at the Polosky garage at the time Polosky said he was, and there, according to his own testimony, for an unlawful purpose—to aid in the sale of intoxicating liquors. We cannot say from the record that the verdict is clearly contrary to the weight of the evidence, as we must say in order to warrant disturbing the verdict, under the well settled rule. *State v. Elliott*, 15 Iowa 72; *State v. Wise*, 83 Iowa 596; *State v. Sullivan*, 156 Iowa 603.

III. Error is assigned in permitting Detective Spencer to testify that Polosky identified defendant from a photograph taken at the police department, as one of the men who held him up. The objection is without merit. Spencer did not testify to any statements made by Polosky. The officer merely stated the fact that Polosky picked out a .certain photograph as being the photograph of the man who held him up. If it was error to admit the testimony, it was not prejudicial to defendant. Defendant had previously been identified by the testimony of Polosky and his sister, Mary Cuknata, as one of the men who came to the Polosky garage, and, later on in the trial, defendant himself testified that he was at the garage, and that, when there, he saw Mrs. Cuknata. In view of the identification of defendant by Polosky and his sister, and the admissions of defendant him-

2. CRIMINAL LAW: evidence: facts in issue: identity of accused.

self, there cannot be said to be any prejudice to defendant in the testimony of Spencer.

IV. It is urged by counsel for appellant that the argument of the prosecuting attorney was unfair, and such as to warrant the granting of a new trial, and that it was error to refuse a new trial. The record is silent with reference to any improper argument, except as contained in some affidavits attached to the motion for a new trial. In *State v. Hart,* 140 Iowa 456, we said:

3. CRIMINAL LAW: new trial: misconduct of counsel.

"Alleged misconduct [in argument] is attempted to be shown by affidavits, which, under our practice, is not permissible."

In the absence of anything in the record to the contrary, we will presume that the statements made by the prosecuting attorney were in response to something said by counsel for appellant. *State v. Cameron,* 177 Iowa 379; *State v. Hart,* supra.

V. Counsel for defendant complain that they were required to proceed with the trial without time for preparation. There is no merit in this assignment. Defendant was indicted in September, and placed on trial early in December. He was represented by an able lawyer all the time after indictment, and was afforded the services of another lawyer several days before the case came on for trial, and had the services of both attorneys on the trial. We think no prejudice resulted to defendant on account of lack of time for preparation for trial. The court did not abuse its discretion in overruling the motion for continuance of the case.

VI. Appellant complains that Instruction 13 is incomplete, in that it confined the jury to a consideration of the evidence adduced, and excluded any reasonable doubt which might arise by reason of the insufficiency or lack or want of evidence on behalf of the State. The instruction complained of does not completely cover this point, but Instructions 14 and 15, read together with Instruction 13, very correctly and fully cover this question.

VII. Appellant assigns as error the overruling of his motion for a new trial, based on newly discovered evidence. The claimed

newly discovered evidence was that of Daniel Kootz, from whom Polosky testified he had received the $500 of which he claims he was robbed. Polosky testified that Kootz paid him $500 on the day of the robbery, and that the money so paid him by Kootz was the money that defendant took from him. In support of the motion for a new trial, appellant presented an affidavit made by Daniel Kootz, stating that he did not pay to Polosky, any time during the month of June, 1921, or at any time within the past two years, the sum of $500, or any large sum of money. It is obvious that, if appellant could produce the testimony of Kootz that Polosky had received no money from him, such testimony would be strongly responsive to the testimony of Polosky, and would tend to rebut it.

4. CRIMINAL LAW: new trial: newly discovered evidence: want of diligence.

The showing of diligence is that appellant and his attorneys did not know of the claim of Polosky that he received from Kootz the $500 of which he claims he was robbed, until Polosky so testified, and that, on the night following the giving of such testimony, they went out to where Kootz lived, four or five miles out in the country from Sioux City, to talk with Kootz, but did not succeed in finding him. They did not have a subpoena issued for the production of Kootz as a witness, which they might have done. There is no claim that Kootz was not in the neighborhood where he lived, and that, if a subpoena had been issued and placed in the hands of an officer for service, Kootz could not have been secured as a witness before the trial closed. The showing does not warrant interfering with the discretion of the trial court in his ruling.

We find no error in the record to warrant disturbing the verdict. The case is—*Affirmed*.

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.